# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 30, 2017

Lyle W. Cayce
Clerk

No. 16-20182

MATTHEW DEWAN, Individually and On Behalf of All Others Similarly Situated; WILLIAM J. CASEY,

      Plaintiffs - Appellants

v.

M-I, L.L.C., doing business as M-I SWACO,

      Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before DAVIS, DENNIS, and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

Two oilfield workers sued their employer for unpaid overtime wages. The district court granted summary judgment on the defendant's affirmative defense that the plaintiffs fell under the administrative exemption of the Fair Labor Standards Act. Finding there to be genuine disputes of material fact that affect whether the exemption applies, we REVERSE and REMAND.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant M-I SWACO is an oilfield service company that specializes in engineering drilling-fluid systems and additives designed to improve

No. 16-20182

performance for oil and gas well drilling operations. As part of its business, M-I employs Drilling Fluid Specialists, or "mud engineers," who work at M-I customer locations to manage the drilling-fluid system and interact directly with the customers by providing advice and other support.

The minimum educational requirement for a mud engineer is a high-school diploma. Once hired, mud engineers undergo an eight-week training program at M-I's office in Houston, Texas. During the program, trainees receive basic instruction on the functions of drilling fluids, their physical and chemical properties, mathematics, and training on the proper use of testing equipment and computer software.

A mud engineer works to ensure the properties of the drilling fluid, also known as drilling mud,[1] are within designed specifications as set forth in the mud plan, which is created by a project engineer at M-I's headquarters and is based on historical drilling in the area. Both plaintiffs claimed that they did not have authority to deviate from the mud plan. Mud engineers perform their duties either by "sitting" on the customer's well (an extended, round-the-clock monitoring of one drill site) or doing a "drive-by" (quick visits to multiple drill sites).

To ensure the drilling mud is performing adequately[2] and within its designated parameters, mud engineers test the mud's pH, rheology, weight, and viscosity. The tests are generally conducted either in a lab trailer at the

---

[1] "Drilling mud comes in many varieties, ranging from water-based fluid mixed with minerals to oil-based fluid with a composition similar to diesel fuel to synthetic oil-based fluid with a composition similar to food-grade mineral oil." *Whiteman v. Chesapeake Appalachia, L.L.C.*, 729 F.3d 381, 383 n.3 (4th Cir. 2013). The mud system is a crucial part of a drilling operation that performs approximately ten functions.

[2] Improperly maintained mud can have severe and costly consequences for the drilling operation. Among the risks are the loss of circulation and stuck pipes, which may cause the drilling operation to stop and require significant repairs.

No. 16-20182

customer's site or on the tailgate of the mud engineer's assigned company vehicle. Plaintiff Dewan testified at his deposition that, after testing was complete, he would provide recommendations to the "company man." These recommendations were largely accepted without further inquiry. The plaintiffs were typically the only M-I employees or mud engineers on site.

M-I employed Plaintiffs Matthew Dewan and William Casey as mud engineers until December 2012. On December 14, 2012, Dewan filed a putative class-action suit against M-I, alleging violations of the overtime provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–19. That same day, Casey consented to join the suit pending collective or class-action certification. After discovery closed, M-I moved for summary judgment on various grounds, including that the plaintiffs were exempt from the FLSA's overtime requirements under 29 U.S.C. § 213(a)(1). The plaintiffs separately moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c).

The district court (1) denied the plaintiffs' motion for judgment on the pleadings; (2) denied M-I's motion for summary judgment as to the claim that Casey was not a party to the lawsuit; (3) denied M-I's motion as to the FLSA's outside sales and combination exemptions; and (4) granted M-I's motion on the grounds that the plaintiffs fell under the FLSA's administrative exemption. The plaintiffs timely appealed.

## DISCUSSION

In 1938, Congress enacted the FLSA in an effort to ensure each employee covered by the Act would receive "[a] fair day's pay for a fair day's work and would be protected from the evil of overwork as well as underpay." *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981). One way the FLSA effectuates these goals is through its overtime provision, which requires an employer to compensate any covered employee who works in excess of 40

hours in a workweek "at a rate not less than one and one-half times the [employee's] regular rate . . . ." 29 U.S.C. § 207(a)(1). Relevant here, the FLSA excludes from its overtime requirement those employees working "in a bona fide executive, administrative, or professional capacity . . . ." *Id.* § 213(a)(1).

The district court granted summary judgment for M-I, holding that these employees were exempt from the overtime rules. In our *de novo* review, we use the same standards as did the district court in considering facts and analyzing law. *Owsley v. San Antonio Indep. Sch. Dist.*, 187 F.3d 521, 523 (5th Cir. 1999). Summary judgment is proper when the movant shows there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a).

When summary judgment is sought on an affirmative defense, as here, the movant "must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir. 1986). "Once the movant does so, the burden shifts to the nonmovant to establish an issue of fact that warrants trial." *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 420 n.4 (5th Cir. 2016). The burden of proof on exempt status is on the employer. *Owsley,* 187 F.3d at 523. Because of the Act's remedial nature, we narrowly construe its exemptions in favor of the employee. *Id.*

To all these statements we add something further. There is no dispute about what these two engineers did from day to day. Even so, more is involved of relevance here than just a record of the plaintiffs' daily activities. Those facts must be interpreted based on the regulations. For the administrative exemption to apply, the employee must be one (1) who is "[c]ompensated on a salary or fee basis at a rate of not less than $455 per week;" (2) "[w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the

employer's customers;" and (3) "[w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200. The compensation of the plaintiffs is clearly sufficient. The second and third criteria, though, require a fact-finder to analyze the facts to determine the employee's primary duty, how the work directly relates to certain parts of the employer's business, and whether the duty involves some discretion and independence.

We choose two examples to make the point. Even if the evidence is undisputed about the mud engineers' activities, a fact-finder might also need to decide if what they do is the equivalent of "perform[ing] specialized work along standardized lines involving well-established techniques and procedures[.]" § 541.203(g). Further, would a fact-finder believe the mud engineers are exercising "discretion and independent judgment" when they perform their tasks, with that quoted phrase requiring consideration of "all the facts involved in the particular employment situation" as further explained by a lengthy list of nonexhaustive factors? *See* § 541.202(b). Most of that is fact-finding, not legal analysis.

It is with these considerations that we unpack the legal question we must answer — namely, do the plaintiffs fall within the FLSA's administrative exemption? "That ultimate determination, however, relies on many factual determinations that can be resolved by a jury." *Singer v. City of Waco*, 324 F.3d 813, 818 (5th Cir. 2003). We agree with one of this court's unpublished opinions that we should consider "the amount of time the employee devotes to particular duties, as well as the significance of those duties . . . ." *Zannikos v. Oil Inspections (U.S.A.), Inc.*, 605 F. App'x 349, 352 (5th Cir. 2015). A check on any finding that facts are undisputed is that "the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

We conclude that there remain genuine disputes of material fact, as we will explain. In summary now, factual issues such as identifying these employees' primary duties, or deciding if they exercised independent judgment and discretion, cannot be resolved without making inferences from the evidence that are subject to genuine dispute. Those interpretations cannot be said on this record to be resolvable on summary judgment.

All this review-standard throat-clearing out of the way, we turn to the issues before us. As we note above, the first criterion of the administrative exemption, which concerns the plaintiffs' weekly earning, is clearly satisfied. Plaintiffs argue, however, that genuine issues of material fact exist as to the second and third criteria. Additionally, the plaintiffs argue the district court placed the burden on them to negate the affirmative defense while allowing M-I to rely on the absence of evidence of any element of the plaintiffs' case. We will address the two contested criteria separately. We conclude there is error as to both criteria and find it necessary to examine each individually to show the extent of the fact-finding still needed on remand.

I.    *Work "Directly Related" to "Management or General Business Operations"*

To repeat, the administrative exemption requires the employee to have as his "primary duty . . . the performance of work directly related to the management or general business operations of the employer or the employer's customers." § 541.201(a). The regulations define an employee's "primary duty" as the "principal, main, major or most important duty that the employee performs." § 541.700(a). The "directly related" test is met by the employee's "assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product

No. 16-20182

in a retail or service establishment." § 541.201(a).  Under that inquiry, it is "the type of work performed by the employee" on which we must focus.  *Id.*

The plaintiffs argue that their job duties — or the types of work they perform as mud engineers — are fundamentally different from the kinds of positions the regulations set out as examples.  Examples of work "directly related to management or general business operations" include such functional areas as human resources, marketing, quality control, and safety and health. § 541.201(b).    Another  regulation  entitled  "Administrative  exemption examples" includes insurance-claims adjusters, financial-services employees, and human-resource managers.  § 541.203.  The plaintiffs argue that their mud-engineer position is far removed from both sets of examples.

The plaintiffs also rely on a recent Texas district court decision that denied summary judgment to an employer on its affirmative defense that its manufacturing engineer was subject to the FLSA's administrative exemption. *See Elliott v. Dril-Quip, Inc.*, No. H-14-1743, 2015 WL 7302764 (S.D. Tex. Nov. 18, 2015).  There, the district court stated that "it is the actual day-to-day activities of the employees that determine whether the employee is exempt, not the labels the employer or employee place on those duties."  *Id.* at *6.  The court found factual issues existed over the second criterion of whether a manufacturing  engineer's  primary  duty  was  directly  related  to  the management or general business operations of the employer or its customers. *Id.* at *6–*9.  There were also factual uncertainties about the third criterion, namely,  whether  the  plaintiff  exercised  the  requisite  discretion  and independent judgment.  *Id.* at *10–*11.  At least for summary judgment, the employer failed to establish that the employee "falls plainly and unmistakably within the terms and spirit of the exemption."  *Id.* at *11 (alteration omitted).

Relying on *Elliott* and the regulations, the plaintiffs argue the district court erred in concluding that they performed non-manual work for M-I or its

7

No. 16-20182

customers. Instead, they contend mud engineers "produce those income-generating services" that are central to M-I's business model. The plaintiffs seek to align their work as mud engineers with that of oil-well drillers. There is support for that comparison, as the Labor Department included oil-well drillers in a list of "Blue-Collar Occupations That Are Most Likely Nonexempt" under the regulations. *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22,122, 22,242 (Apr. 23, 2004) (as codified at 29 C.F.R. pt. 541).

This court has addressed the needed analysis in a few opinions. Particularly relevant is a case in which we stated that the relevant distinction "is between those employees whose primary duty is administering the business affairs of the enterprise [and] those whose primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to produce and market." *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1230 (5th Cir. 1990). Other circuits have thought to label this distinction as the "administrative-production dichotomy, under which production employees (whose job it is to generate the product or service the business offers to the public) will not qualify for the exemption." *Foster v. Nationwide Mut. Ins. Co.*, 710 F.3d 640, 644 (6th Cir. 2013). Some courts, though, have doubted, saying such a distinction is more in keeping with the "industrial age" and not so much "the modern service-industry context." *Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 872 (7th Cir. 2008). Indeed, "[t]he line between administrative and production jobs is not a clear one, particularly given that the item being produced . . . is often an intangible service rather than a material good." *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 532 (2d Cir. 2009).

Applying these concepts if not the analytical labels to our case, the undisputed evidence is that the plaintiffs' work requires continuous and

8

regular contact with the company men at the drilling location where they are assigned. The plaintiffs provide recommendations, anticipate the customer's concerns with the drilling mud, then address those concerns on M-I's behalf. Based on this evidence, the district court found the plaintiffs performed work that "directly related to the general business operations of the employer or the employer's customers, which was their principal value to M-I and its business of supplying drilling fluid systems engineered to improve, even optimize, drilling performance to the oil industry while reducing costs."

It is true that Section 541.201(a) provides that the administrative exemption applies to work relating to the "general business operations" of an employer. What needs to be kept distinct, though, is that the exemption applies when the employee is involved with "administering the business affairs of the enterprise," not with "producing the commodity" of the business. *Dalheim*, 918 F.2d at 1230. Supplying the drilling-fluid systems seems more related to producing the commodities than the administering of M-I's business.

The district court also found that "nearly all of [the plaintiffs'] working time related directly to continually monitoring the mud for quality control, in compliance with 29 C.F.R. § 541.201(b) . . . ." That section of the regulation identifies functional areas that are directly related to management and includes "quality control" in a list that also contains "areas such as tax; finance; accounting; budgeting; auditing; insurance; . . . purchasing; procurement;" and others. 29 C.F.R. § 541.201(b). The regulation's reference to "quality control," particularly considering the list of which it is a part, seems to mean the quality of the mud being provided to M-I's customers and not with monitoring and adding materials to the mud as it is being used in drilling wells to ensure that its properties stay within the specifications set forth in the mud plan developed by project engineers.

The district court also determined that the plaintiffs' work as mud

engineers was "directly related to the general business operations" because the plaintiffs "acted as advisors or consultants to M-I's customers, in compliance with 29 C.F.R. § 541.201(c)."  That regulation only sets forth two examples of the types of employees that may be exempt: tax experts and financial consultants.  29 C.F.R. § 541.201(c).

We find an opinion from another Circuit to be instructive on the type of work that an exempt advisor or consultant must perform.  *See Bratt v. Cnty. of Los Angeles*, 912 F.2d 1066, 1070 (9th Cir. 1990).  In determining whether probation officers fit within the regulation's concept of advisor, that court held this to be the test: "whether the activities are directly related to *management policies* or *general* business operations."  *Id.*  That is, the focus is not on a general concept of advice or consultancy but rather on "policy determinations [for] how a business should be run or run more efficiently . . . ."  *Id.*  Through that lens, the probation officers were not clearly "engaged in 'servicing' a business within the meaning of" the regulations.  *Id.*

Further support for this reasoning can be found in a 1997 opinion letter issued by the Wage and Hour Division of the Department of Labor, which is "entitled to respect" to the extent it is persuasive.  *See Christensen v. Harris Cnty.,* 529 U.S. 576, 587 (2000).  In responding to an inquiry on whether background investigators fit within the FLSA's administrative exemption, the opinion letter clarified the type of advice an exempt employee provides:  the relevant regulation "is directed at advice on matters that involve policy determinations, i.e., how a business should be run or run more efficiently, not merely providing information in the course of the customer's daily business operation."  U.S. Dep't of Labor, Wage & Hour Div., Op. Letter (Sept. 12, 1997).  Generally, this requires an exempt employee to participate "in important staff functions of the employer or the employer's clients or customers as opposed to the production functions."  *Id.*

Finally, one of our unpublished opinions explains in a useful context the type of advisory role an exempt employee must perform. *See Zannikos*, 605 F. App'x at 350. We held that the plaintiffs' work as marine superintendents fit within this element of the administrative exemption; the employees argued they did not perform non-manual work directly related to the general business operations of the employer's customer. *Id.* at 353. Our analysis required us to be fairly precise about the work:

> The plaintiffs' work, including that relating to line blending, primarily included supervision, quality control, and ensuring compliance with applicable standards. They did not transfer oil, blend oil, or manufacture or sell petroleum products themselves. Instead, they oversaw these functions and provided [the employer's] customers with inspection and operational support services. Such services are not considered production.

*Id.*

We also found that the employees' "primary duties included work in several functional areas explicitly listed as administrative in Section 541.201(b), including quality control, safety, and legal and regulatory compliance." *Id.* Having "concluded that the plaintiffs performed non-manual work directly related to the management of [the employer's] customers," we deemed it "inconsequential" whether they performed the same task "directly related to the management" of their employer. *Id.* at 354.

There are significant distinctions between the work performed by these mud engineers and the *Zannikos* marine superintendents. The latter oversaw the work performed by the customers' employees, contractors, and equipment. *Id.* at 351. Mud engineers, on the other hand, neither assured compliance with health and safety standards nor engaged in tasks likely to qualify as the "general administrative work applicable to the running of any business." *See Davis*, 587 F.3d at 535. "[W]ork that [i]s primarily functional rather than

11

conceptual" does not meet the standard. *See id.* We conclude that the district court erred in granting summary judgment on the issue of whether the plaintiffs' work could be classified as office or non-manual work directly related to the general business operations of M-I's customers.

## II.    *Discretion and Independent Judgment in Matters of Significance*

The final criterion for the administrative exemption requires that an employee's primary duty "include the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.202(a). The phrase "matters of significance" is defined to "refer[] to the level of importance or consequence of the work performed." *Id.* Additionally, the regulations require that the "exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." § 541.202(e). Notably, "employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level." § 541.202(c).

The regulations provide a non-exclusive list of factors relevant to this criterion. Included are "whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; . . . whether the employee has authority to waive or deviate from established policies and procedures without prior approval; [and] whether the employee has authority to negotiate and bind the company on significant matters[.]" § 541.202(b). The employee's degree of discretion must be considered "in the light of all the facts involved in the particular employment situation in which the question arises." *Id.*

The district court concluded that the matter of significance over which the plaintiffs exercised the requisite discretion and independent judgment was

the "quality control of the condition of the mud . . . ." The district court determined that Dewan and Casey's primary duty "involved first determining the condition of the mud in various locations admittedly through a variety of fairly standard tests" and then deciding "which of various additives and treatments of the mud or what tradeoffs would optimize drilling performance . . . ." In effect, the court reasoned that the engineers evaluated alternate courses of action and thereby satisfied the need for exercising "discretion and independent judgment," which the relevant regulation describes as "the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." § 541.202(a).

The district court also found that the plaintiffs' work affected M-I's operating procedures, which is one of the non-exhaustive factors the regulations identify. The court based its determination on the fact that although plaintiffs "strove to stay within the parameters of the mud plans created by engineers in M-I's offices, they could deviate from or go outside of those parameters when conditions required them to" do so.

Also relevant is whether the plaintiffs had "authority to make an independent choice, free from immediate direction or supervision." § 541.202(c). The district court found that even though there were "distinctions between Dewan and Casey's experiences," both mud engineers acted with limited supervision and made independent choices. The district court considered that the regulation explicitly "does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review." Recommendations at times can suffice, and occasional review by higher-level employees does not prevent a finding that discretion and independent judgment are being exercised. *See* § 541.202(c).

The plaintiffs disagree with the defendants' argument that the plaintiffs

"had the requisite discretion and independent judgment so long as they stayed within the parameters outlined in the mud plan." The plaintiffs rely on a non-binding district court decision that rejected a similar argument involving the work of a manufacturing engineer. *See generally Elliott,* 2015 WL 7302764. There, the district court determined even though the employee "used his experience and knowledge," much of the manufacturing engineer's work was "routine or copy and paste." *Id.* at *11.

There is little evidence that the plaintiffs were given "authority to formulate, affect, interpret, or implement management policies or operating practices[.]" 29 C.F.R. § 541.202(b) (factor one). Both Dewan and Casey testified that they lacked such authority. Dewan stated that he "didn't have the authority to change what was in the mud program." Instead, he could "make recommendations based on the drilling — the drilling procedures that were going on and all that, and then get approval if they wanted to change it." Casey agreed with the question that if he believed a change needed to be made in order to stay in compliance with the drilling plan, "you have to raise that to the people above you; right?"

A reasonable jury could credit this testimony and find that the plaintiffs exercised no discretion as mud engineers and merely "appl[ied] well-established techniques, procedures or specific standards described in manuals or other sources." *See id.* § 541.202(e). By regulation, there is no exemption if employees "simply apply well-established techniques or procedures described in manuals or other sources within closely prescribed limits . . . ." *Id.* § 541.704. Other Section 541.202(b) factors for which there was no evidence include whether the employees had the authority to commit M-I in matters that have significant financial impact, or negotiate and bind M-I on significant matters, or represent M-I in handling complaints, arbitrating disputes, or resolving grievances.

Moreover, a review of the plaintiffs' responsibilities suggests that their work involved little more than "the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources," § 541.202(e), and that they primarily performed "inspector-type duties" consisting of "specialized work along standardized lines involving well-established techniques and procedures[,] which may have been catalogued and described in manuals or other sources," *Clark v. Centene Co. of Texas, L.P.*, 656 F. App'x 688, 692 (5th Cir. 2016) (unpublished) (quoting § 541.203(g)).

This limited factual record could reasonably be interpreted to provide two different understandings of the scope of the plaintiffs' discretionary authority and independent judgment. This is evidence that must be weighed by a jury. Notably, a vast majority of this contrary evidence comes from the plaintiffs' own testimony. "To the extent the testimony of a witness who is also a party may be impaired by party self-interest, it is ordinarily the role of the jury—not the court on summary judgment—to discount it accordingly." *Johnson v. Perez*, 823 F.3d 701, 710 (D.C. Cir. 2016). This is such a case.

However close the determination may be, M-I has not established its affirmative defense beyond peradventure. *See Smith*, 827 F.3d at 420 n.4.

We REVERSE and REMAND for further proceedings consistent with this opinion.